ROYAL INSURANCE COMPANY, Limited, a Foreign Corporation, et al.,
Appellants,

v.

The SISTERS OF the PRESENTATION,
a California Corporation, Appellee.

No. 23009.

United States Court of Appeals,
Ninth Circuit.

July 29, 1970.

Rehearing Denied Sept. 17, 1970.

Augustus Castro, and John D. Hoffman, (argued) San Francisco, Cal., for appellants.

John Hopkins, (argued), John J. Ford, III, of Tobin & Tobin, San Francisco, Cal., for appellee.

Before CHAMBERS, ELY, and TRASK, Circuit Judges.

ELY, Circuit Judge:

This action arose in a California state court from which it was removed to the District Court under 28 U.S.C. § 1441 (a). The suit was based on a policy of fire insurance written by appellant Royal on a convent formerly occupied by the appellee Sisters. The building was destroyed by fire, the Sisters won a $174,000 judgment, and Royal appeals. We reverse.

The building was constructed in 1877 and burned eighty-nine years later, on June 8, 1966. For several years before the fire, it had been used by the Sisters as a residence for their members who were teaching at a high school and an elementary school operated by the Sisters. The two schools and the convent were located on adjacent parcels of land, and the Bishop of Oakland, California, owned another adjoining, vacant parcel of property. The convent building, located in Berkeley, California, became so totally out of repair that Berkeley's Building Inspector classified it as "unfit for human occupancy" in February 1961. The Sisters were finally able to escape their difficulties through negotiations with the Bishop, and in 1964 they signed a contract under which the Bishop agreed to convey his adjoining parcel of land to the Sisters and erect a new convent on that property. In return, the Sisters agreed to hold, in perpetuity, their site for the use of the high school, whose facilities were to be expanded at the Bishop's expense so that they would occupy the location of the old convent. The parties filed a "Master Plan" with the city council, setting out the proposed steps of the project. On the basis of the representations in the plan, the city abandoned a street that extended between the parcels and granted permits for the construction of the new buildings.

The Bishop undertook the performance of his obligations under the contract by contracting with a builder for the demolition of the old convent, the preparation of its site for the high school's expansion, and the construction of a new convent. The general contractor in turn subcontracted the demolition work.

The new convent was completed, and the Sisters moved into it before June 4, 1966, when an auction was held at the premises of the old convent, disposing of all movables thereon that could be sold. The utilities were disconnected, all the fixtures, doors, and stained glass windows were removed, and the property was turned over to the demolition contractor. Thereafter, on the day of the fire, an employee of the demolition contractor had removed all of the drainage pipes in final preparation for demolition, although a demolition permit was not formally obtained from the city until the day after the fire. A police investigation created suspicion that intruders had occupied the abandoned building and that they were responsible for the fire.

The suit was tried without jury, and the District Court held that the Sisters retained, at the time of the fire, sufficient insurable interest under California law. Its damage award was based upon the theory of replacement cost less depreciation, which consisted of a computation of the cost of constructing the same building today and subtracting therefrom an essentially arbitrary figure, approximately fifty percent, for "physical depreciation." The court also awarded interest on the judgment, running from the date the Sisters filed their claim of loss. Royal protests that it is illegal, if not almost miraculous, that at this point, the Sisters and the Bishop have been relieved of the burden of the derelict old building while, at the same time, standing to collect almost a quarter of a million dollars for their "loss."

■ The threshold question is, of course, whether the Sisters retained the

necessary insurable interest in the building at the time of the fire. California defines an insurable interest as an "interest * * * of such a nature that a contemplated peril might directly damnify the insured." Cal.Ins.Code § 281. The cases decided under this section have established that insurable interest consists of pecuniary interest. *E.g.*, Davis v. Phoenix Ins. Co., 111 Cal. 409, 43 P. 1115 (1896); Martin v. State Farm Mutual Auto. Ins. Co., 200 Cal.App.2d 459, 19 Cal.Rptr. 364 (1962). Moreover, it is provided by California statute that it is the interest of the person that is insured under an insurance policy, not the property itself. Cal.Ins.Code § 284. Thus, in applying California's law, we are required to examine the realities, economic or otherwise, of a situation rather than merely looking at technical concepts of title.

■■ At the time of the fire in this case, the Sisters had abandoned the old building and moved into the new. Under their agreement with the Bishop, they had already obligated themselves to surrender the building for demolition. They had already received new land and a new building in exchange for their contractual agreement that the old land would be held for occupancy by the expanded high school. This declaration of prospective use may, of itself, have been sufficient to divest the Sisters of beneficial ownership of the property at the time of the agreement, but we need not make that decision. What is most important is that since all of the Bishop's contractual obligations had been performed, the Sisters could not legally escape their obligation to allow destruction of the old convent. This obligation would undoubtedly have been specifically enforceable against them by the Bishop, because it dealt with the use of land, a unique property. Furthermore, the general contractor might have specifically enforced the chain of contracts under California law. "Where the plaintiff is not interested solely in profit from the agreement but must proceed with the work in order to fulfill contract obligations to others, * * * damages may be inadequate and the plaintiff may have a right to continue performance." Bomberger v. McKelvey, 35 Cal.2d 607, 614, 220 P.2d 729, 733 (1950).

In all the circumstances, we cannot perceive that the Sisters, at the time of the fire, held any pecuniary interest whatsoever in the abandoned building. Indeed, the Sisters' Mother Superior testified that the Sisters could have had no use for the building at all unless the new convent should have burned down before the old building was demolished. It was upon that testimony that the court apparently based its finding of

"an insurable interest which would have proved quite important and valuable to the sisters if the new convent had burned before actual demolition of the old one and the sisters had been forced to return to it. Thus, the old convent building still had a potential use for the sisters until its actual demolition."

■ For several reasons, we think the finding of pecuniary interest to the Sisters cannot be sustained upon the basis of the possibility that the newly occupied convent might be destroyed. In the first place, the possibility was so remote as to be almost negligible. Secondly, the series of contracts were all specifically enforceable, so that the Sisters would have had no right to reinhabit the old building. Third, the city's Building Inspector testified that under no circumstances would the Sisters have been allowed to reinhabit the old building until it was brought into conformity with the Building Code. Expert testimony placed the cost of required repairs at approximately $120,000, even before the building was stripped of fixtures, doors, windows, and plumbing and electrical equipment. It is unreasonable to believe that the Sisters, had their new convent been destroyed by fire, would have expended more than $120,000 to restore the deserted building to legally habitable use when insurance

proceeds would have been available for replacement of the new building.

It is true that the Sisters had not formally transferred their legal title to the premises. But we have already pointed out that, under California law, the existence of insurance interest hinges on economic interests rather than upon naked legal title. In Smith v. Jim Dandy Markets, Inc., 172 F.2d 616 (9th Cir. 1949), the legal owner of a building sold all the equipment and supplies related to the building and leased the building itself. Our court, applying California law, held that the holder of the legal title had lost his insurable interest by operation of the contractual arrangements.

Results in other jurisdictions have been similar. In Leggio v. Millers Nat'l Ins. Co., 398 S.W.2d 607 (Tex.Civ.App. 1965), the owner of a building had given his lessee an option to demolish the building and replace it with a new structure. The building burned, and the court held that if the option had been effectively exercised before the fire, even though nothing had been done toward demolition, the owner no longer held a pecuniary interest and hence, had divested himself of insurable interest. Even more persuasive is a very recent case, Woodruff v. Southeastern Fire Ins. Co., 426 F.2d 555 (5th Cir. 1970). There, a contract for dismantling a building had been signed, and the dismantling work had begun when the building was destroyed by fire. Even though the building was to be reconstructed on another location and thus had some value to the owner, the court held that since it, as a standing building, was of no pecuniary value to the owner, he no longer had an insurable interest in it. The Fifth Circuit wrote:

"Fire insurance policies are, of course, carefully prepared and written in the light of the many interpretations of various clauses and provisions over a long period of time. However, in no case brought to our attention or which our research has disclosed has coverage been held to continue after such radical changes, both in the interest of the insured and in the use and occupancy of the building, had resulted in a complete and permanent abandonment of any use of the structure as a building. Those changes had caused the structure to cease to exist as a part of the premises or real property and to become personalty, no more than building materials, albeit retaining the outward hull or form of a building. For any use at the location to which the insurance was confined the building as such had ceased to exist before the fire occurred. There was never any contract to insure building materials."
*Id.* at 562.

Each of the foregoing three cases illustrates the principle, adopted by statute in California, that it is the interest of the insured, not the building, that is the real subject of fire insurance.[1] *Cf.* Continental Ins. Co. of New York v. Cotten, 427 F.2d 48 (9th Cir. 1970).

■ The trial court waved aside the fact that the new convent had been received and occupied by the Sisters, referring to it as a "collateral benefit" that could have no effect on the supposed insurance obligation. The court cited Hughes v. Potomac Ins. Co., 199 Cal.App. 2d 239, 18 Cal.Rptr. 650 (1962), for this proposition. The "collateral benefit" rule deals with nothing more than the effect of overlapping indemnities for a particular loss. *Hughes* and the cases therein cited simply hold that an insurer is liable for the full loss despite the fact that indemnification after the loss was made by a third party. In contrast, the

---

[1]. We note that the insurance policy contains a "Debris Removal Clause," under which the Sisters might have sought recovery of any expense incurred by them in removing the fire's remains. Their complaint, however, contains no specific reference to any such loss, nor does the District Court's pre-trial order. From this, and from the fact that the judgment was based solely upon the supposed value of the standing building, we must infer that the Sisters, because of the contracts with the Bishop and the contractor, incurred no such expense.

new convent built by the Bishop in the present case did not operate to relieve the Sisters from a loss, but instead was only one element of transactions which, as a whole, prevented the Sisters from suffering any loss in the first place.

Upon remand, the complaint will be dismissed.[2]

Reversed.

2. Royal argues that the same result would be compelled in this case if we were to focus only upon the question of damages, assuming that the Sisters had retained an insurable interest in the property. It makes a compelling argument for the proposition that California courts would adopt what is known as the "broad evidence" test of damages, as that test was formulated in McAnarney v. Newark Fire Ins. Co., 247 N.Y. 176, 159 N.E. 902 (1928). Under that test, the court would look at all of the economic realities of a situation rather than simply computing the cost of replacement less depreciation, as was done here. Doing so, the conclusion here would necessarily be that the old convent had no actual cash value. *See* Board of Education of Hancock County v. Hartford Fire Ins. Co., 124 W.Va. 163, 19 S.E.2d 448 (1942). We need not now speculate as to the test which California might have applied. Nor do we reach the contentions that the Sisters, by their neglect of the building, were responsible for the fire or that the trial court erred in awarding interest on the judgment from the time of the filing of the claim.